# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CR-19-33-D |
| ) | |
| JASON KOMSONEKEO, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Before the Court is Defendant's Motion to Suppress Evidence [Doc. No. 14], which the United States timely opposed [Doc. No. 15]. A hearing was held on May 28, 2019, at which Defendant personally appeared with appointed counsel, Assistant Federal Public Defender Paul Antonio Lacy, and the United States appeared through Assistant United States Attorney Ashley Altshuler. The Court received the testimony of two witnesses: Oklahoma Highway Patrol ("OHP") Troopers Brady Webb and Chase Miller. A video[1] depicting the traffic stop was admitted as evidence and portions were played during the hearing. Gov't Ex. No. 1. Following the hearing, the United States submitted a supplemental brief. [Doc. No. 19]. Upon consideration of the filings and evidence presented, the Court issues its ruling.

Defendant is charged in a one-count indictment with being a felon in possession of two firearms on January 10, 2019, in violation of 18 U.S.C. § 922(g)(1). [Doc. No. 1].

---

[1] The Court has reviewed the video.

Defendant seeks to suppress evidence obtained from the rental car he was driving and statements he made on January 10, 2019.

## FACTUAL BACKGROUND

On January 10, 2019, at 7:50 p.m., OHP Trooper Brady Webb was sitting in his patrol car, which was parked in the center median, monitoring westbound traffic on Interstate 40. Using a handheld radar, Trooper Webb clocked Defendant's vehicle (2019 Chevy Cruze) traveling westbound on I-40 at 76 mph in a posted 70 mph zone. Trooper Webb followed the vehicle in his patrol car, and using his patrol car's front antenna same direction radar[2] clocked the vehicle's speed at 76 mph. In addition, he paced Defendant's vehicle with his patrol car's speedometer at 76 mph. At that point, Trooper Webb initiated a traffic stop of Defendant's vehicle just past Garth Brooks Boulevard on westbound I-40.

Trooper Webb approached Defendant's vehicle on the passenger side and introduced himself. He informed Defendant of the reason for the traffic stop, and asked Defendant for his driver's license. Trooper Webb asked Defendant to walk back to his patrol car with him. He told Defendant he was going to issue him a warning and then Defendant could be on his way.

Trooper Webb testified that when he was standing at the passenger side of Defendant's vehicle he observed a bottle of Febreze spray on the back floorboard behind the passenger seat; a new air freshener hanging from the gear shift; an excessive number

---

[2] Trooper Webb testified that he had tested the accuracy of his patrol car's radar with tuning forks both before and after his shift on January 10, 2019.

of energy drinks[3] in the center console; a large Smartphone on a stand in the cup holder; an older model flip phone in the front passenger seat; a Chicago Bears jersey hanging in the backseat; a duffle bag of clothes on the backseat; and multiple food wrappers throughout the vehicle. Defendant was the only occupant of the vehicle.

Trooper Webb indicated that the air freshener smell was strong, made his eyes water and nose burn, and was particularly significant given that Defendant was driving a 2019 model vehicle. Relying on his interdiction training and experience, Trooper Webb testified that people use air fresheners to try to mask the odor of illegal substances from an officer or a canine; that a large amount of energy or caffeinated beverages is indicative of nonstop cross-country travel; and the possession of multiple cell phones, including a cheap, older model pre-paid flip phone, is a common indicator of possible criminal activity. He advised that these types of phones are commonly used to coordinate criminal activity because they are hard to trace and can be discarded at a moment's notice.

Trooper Webb opined that Defendant was overly nervous. When Trooper Webb approached the vehicle, Defendant gripped the steering wheel tightly. Defendant's hands shook when he gave Trooper Webb his driver's license, and his voice cracked when he said his name. Upon advising Defendant that he was going to write him a warning and then Defendant could be on his way, Defendant's level of nervousness increased. During their conversation in the patrol car, Defendant played with his hair and rubbed sweat off his hands onto his pants, even though it was cold outside and the interior temperature of the

---

[3] Trooper Webb testified that Defendant had two 5-hour energy shots, an almost empty cup of coffee, and an unopened can of Red Bull in the car.

3

patrol car was comfortable. In addition, Defendant responded to Trooper Webb's questions with "huh" and repeated the questions asked. Trooper Webb testified that, based on his training and experience, he viewed this as a stall tactic to allow Defendant to develop answers to the questions.

Trooper Webb testified that Defendant gave inconsistent and vague information regarding a Chicago Bears football game he claimed to have recently attended while traveling and who accompanied him to the game. Initially, Defendant said he went with friends, but he later stated that he went with a family member. When asked to identify the family member, Defendant responded, "a family member" and that "family is family." Later, Defendant indicated that "they" were Philadelphia fans. Thus, Defendant's account of who accompanied him to the game changed from friends to one family member to two family members.

Trooper Webb also indicated that Defendant's travel plans were unusual. Defendant purportedly flew one-way from Fresno, California, to Fayetteville, Arkansas, and then drove 10 hours to Chicago to watch the game, and drove another 10 hours back to Fayetteville. The morning of January 10, Defendant rented a car to make the 24-hour drive from Fayetteville back home to Fresno, California. Trooper Webb opined that although the travel plans were not so implausible to independently suggest criminal activity, they were worthy of consideration along with the other factors identified.

Eight minutes into the traffic stop, Trooper Webb believed, based on his training and experience in criminal interdiction, that he had reasonable suspicion to prolong the traffic stop. The factors he identified as giving rise to reasonable suspicion included: the

4

overwhelming odor and presence of air freshener; two cell phones; the excessive number of energy drinks; Defendant's overly nervous behavior, his inconsistent account of who he went to the game with, and his unusual travel plans; and the fact that Defendant's sole source of income was derived from his work as his mother's caretaker, yet Defendant was able to afford airfare, a rental car, and a ticket to an NFL playoff game.

Trooper Webb asked Defendant for his consent to search the vehicle. When Defendant did not consent to the search, Trooper Webb told Defendant to stay in the patrol car while he requested a canine to perform a free-air sniff around the vehicle. Trooper Webb testified that Trooper Miller arrived with his working dog, Cash, about eight minutes later.

Trooper Miller has been an OHP trooper since February 2009 and a CLEET certified canine handler since October 2014. Cash, is a nine-year old Belgian Malinois, assigned to the OHP. Trooper Miller became Cash's handler in October 2014. Cash has been CLEET certified since that time. Trooper Miller testified that Cash is in good health and was in good health on January 10, 2019. He opined that Cash is "extremely accurate" in finding and communicating the odor of narcotics, and he has never had a false positive. He advised that Cash has been utilized hundreds of times to detect the odor of narcotics.

Trooper Miller testified that Cash is a single purpose canine trained to locate narcotics. Cash has been trained in all weather conditions and completes monthly maintenance training. Cash has been trained to alert to the odor of narcotics; he can detect a lingering or dead scent odor, *i.e.*, he can detect lingering odors even when the substance

is no longer present. His training also included odor distractions. He is a passive alert dog, which means he will sit in the immediate area where he detects the origin of an odor.

Trooper Miller testified that on January 10, 2019, he was a few miles away and responded to the traffic stop in less than 10 minutes after being called. Trooper Miller and Cash, following their normal routine, began the free-air sniff of Defendant's vehicle at the front passenger side of the vehicle. Consistent with Trooper Miller's testimony, the video shows Cash alerting on the passenger side of the vehicle between the front and back doors.

Subsequently, Trooper Webb performed a probable cause search of the vehicle. A large amount of United States currency and two firearms were found inside the trunk.[4] A separate sniff was conducted by Cash of the currency at Troop SO Headquarters in Oklahoma City, and Cash alerted to the currency and its wrapping. After shaking the currency and a portion of its wrapping, a field test was performed on the results of the shake. The results were presumptively positive for marijuana.

## ANALYSIS

The parties agree that the initial stop was lawful. Defendant was driving 76 mph in a posted 70 mph zone. The parties' central disagreement is whether Trooper Webb had reasonable suspicion that Defendant was engaged in criminal activity to warrant Defendant's extended detention.

---

[4] Inside the trunk was a gift-wrapped box containing multiple manila envelopes with vacuum-sealed bags that held the currency. In one vacuum-sealed bag was a white box with a Glock pistol. Also located in the trunk was a cloth gun case that held a semi-automatic rifle with loaded magazines.

## A. Scope and Duration of the Traffic Stop – Reasonable Suspicion

A traffic stop is a seizure for purposes of the Fourth Amendment. *United States v. Oliver*, 363 F.3d 1061, 1065 (10th Cir. 2004). "It is well established that, during a routine traffic stop, an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings." *United States v. Pettit,* 785 F.3d 1374, 1379 (10th Cir. 2015). An officer may also ask about a driver's travel plans and about matters unrelated to the stop. *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001); *Pettit*, 785 F.3d at 1379. However, a lawful traffic stop may not extend beyond the time "reasonably required" to effectuate the purpose of the stop. *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015). Beyond that point, "[c]ontinued detention is lawful only if the encounter becomes consensual or if, during the initial lawful traffic stop, the officer develops a reasonable suspicion that the detained person is engaged in criminal activity." *Pettit*, 785 F.3d at 1379 (*citing United States v. Bradford*, 423 F.3d 1149, 1156-1157 (10th Cir. 2005)).

Although the United States bears the burden of proving the reasonableness of the officer's suspicion, "[r]easonable suspicion is not, and is not meant to be, an onerous standard." *United States v. Simpson*, 609 F.3d 1140, 1153 (10th Cir. 2010). "Reasonable suspicion requires 'considerably less' than a preponderance of the evidence and 'obviously less' than probable cause to effect an arrest." *Pettit*, 785 F.3d at 1379 (*citing United States v. Esquivel-Rios*, 725 F.3d 1231, 1236 (10th Cir. 2013)). To satisfy this standard, an officer is not required to "rule out the possibility of innocent conduct" or have evidence suggesting "a fair probability of criminal activity." *Esquivel-Rios*, 725 F.3d at 1236. Rather, the

officer must have a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* Further, the existence of objectively reasonable suspicion "'does not depend upon any one factor, but on the totality of the circumstances.'" *Simpson*, 609 F.3d at 1146 (*quoting United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993)).

In deciding whether the United States has met this burden, the Court defers "to an officer's ability to distinguish between innocent and suspicious actions"; thus, the "evaluation is made from the perspective of the reasonable *officer*, not the reasonable person." *Simpson*, 609 F.3d at 1146-1147 (internal quotation marks omitted; emphasis in original). The Court must review the factors enumerated by Trooper Webb, both individually and in the aggregate, to determine whether, under the totality of the circumstances, those factors give rise to reasonable suspicion. *United States v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998). Finally, "reasonable suspicion may exist even if each of the factors alone is susceptible of innocent explanation." *United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003).

Although the factors identified by Trooper Webb may not independently provide reasonable suspicion of illegal activity, the Court finds that the factors in their totality establish reasonable suspicion supporting Defendant's extended detention.

*1.  Excessive Nervousness*

Because it is common for most people to show signs of nervousness when confronted by law enforcement, "[o]rdinary nervousness alone cannot serve as the basis for reasonable suspicion." *Pettit*, 785 F.3d at 1380.  "Extreme and persistent nervousness, however, 'is entitled to somewhat more weight.'"  *Simpson*, 609 F.3d at 1148 (*quoting United States v. West*, 219 F.3d 1171, 1179 (10th Cir. 2000)).  The Court must look for signs of nervousness that go "beyond those normally anticipated during a citizen-police encounter."  *Salzano*, 158 F.3d at 1113.

Defendant's nervousness was visible on the video, and Trooper Webb identified what he perceived to be indicators of abnormal nervousness from Defendant.  *See, e.g., Simpson*, 609 F.3d at 1148 (the court must examine "specific indicia that the defendant's nervousness was extreme, rather than credit an officer's naked assertion.").  Trooper Webb testified that Defendant gripped the steering wheel tightly, his hands shook when he handed Trooper Webb his license, and his voice cracked when he said his name.  The Court finds it particularly significant that Defendant's nervousness level visibly increased after Trooper Webb assured him he would issue a warning and then Defendant could be on his way.  *Id.* (considering that the trooper could see the defendant's body "trembling" even after he was assured he would not get a ticket).

During the eight-minute conversation, Defendant is seen on the video playing with his long hair 15 times.  Trooper Webb testified on cross-examination that although the air from the AC vent was blowing in Defendant's face, it was not causing Defendant's hair to move.  The Court has viewed the video and agrees with that description.

9

*2. Air Freshener*

An odor-masking agent "may give rise to reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs." *Salzano,* 158 F.3d at 1114. "The Tenth Circuit has consistently held that the scent of air freshener is properly considered as a factor in the probable cause analysis." *West*, 219 F.3d at 1178. Trooper Webb testified that inside Defendant's vehicle was a bottle of Febreze spray and a blue tree air freshener hanging from the gear shift. He indicated that the scent from the air freshener was strong and caused his eyes to water and his nose to burn. Relying on his interdiction training and experience, Trooper Webb testified that people often use air fresheners to mask the odor of drugs. He also found the use of air freshener in this instance significant given that the rental car was new.

*3. Multiple Cell Phones*

Inside the car were two cell phones: a large Smartphone on a stand in the cupholder and an older model flip phone in the front passenger seat. Defendant was the only occupant of the vehicle. Trooper Webb testified that the possession of multiple cell phones, including a cheap, older model pre-paid flip phone, is a common indicator of possible criminal activity. He advised that these types of phones are commonly used to coordinate criminal activity because they are hard to trace and can be discarded at a moment's notice.

*4. Energy Drinks and Caffeinated Beverages*

Trooper Webb testified that Defendant had two 5-hour energy shots, an almost empty cup of coffee, and an unopened can of Red Bull in the car. He advised that a large

amount of energy or caffeinated beverages is indicative of "hard travel" or driving to a destination with no plans of stopping to rest.[5]

### 5. *Inconsistent or Vague Statements*

Trooper Webb testified that Defendant gave inconsistent and vague information regarding who accompanied him to the Chicago Bears game. Initially, Defendant said he went with friends, but he later stated that he went with a family member. When asked to identify the family member, Defendant responded, "a family member" and that "family is family." Later, Defendant indicated that "they" were Philadelphia fans. Thus, Defendant's account of who accompanied him to the game changed from friends to one family member to two family members.

In addition, Defendant responded to Trooper Webb's questions with "huh" at least seven times and, at times, repeated the question before answering it. Trooper Webb testified that, based on his training and experience, he viewed this as a stall tactic to gain time to develop answers to the questions. This is especially apparent at 7:24 on the video:

| Trooper Webb: | "So, who all went with you to the game"? |
| Defendant: | "Hmmm"? |
| Trooper Webb: | "Who went with you to the Bears game"? |
| Defendant: | "Who all went with me? A family member." |

---

[5] The Court does not find this factor particularly persuasive. The amount of energy or caffeinated beverages consumed by an individual could certainly vary depending on the individual and could have no relation to the length of travel. *See Simpson*, 609 F.3d at 1152 (the presence of energy pills "adds no weight to the reasonable suspicion analysis as it would be likely to find such items in the vehicle of any innocent traveler.").

This answer was also inconsistent with his previous statement that he went with friends.

### 6. *Unusual Travel Plans*

Trooper Webb also indicated that Defendant's travel plans were unusual. Defendant flew one-way from Fresno, California, to Fayetteville, Arkansas, and then drove 10 hours to Chicago to watch the game, and drove another 10 hours back to Fayetteville. The morning of January 10, Defendant rented a car to make the 24-hour drive from Fayetteville back home to Fresno, California.[6] Trooper Webb opined that although the travel plans were not so implausible as to independently suggest criminal activity, they were worthy of consideration along with the other factors identified.

The Tenth Circuit has consistently held that implausible travel plans can contribute to reasonable suspicion. *Pettit,* 785 F.3d at 1381. However, "a one-way flight in one direction and a one-way rental vehicle in the other direction is not the type of unusual itinerary that gives rise to reasonable suspicion." *United States v. Karam*, 496 F.3d 1157, 1165 (10th Cir. 2007). The Tenth Circuit has been "reluctant to deem travel plans implausible … where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make." *Simpson*, 609 F.3d at 1149.

On cross-examination of Trooper Webb, defense counsel attempted to provide some clarification or context regarding Defendant's travel plans. For instance, the NFL playoff

---

[6] The Court would note that the rental agreement, which was in Defendant's name, was for two days. Also, a Chicago Bears jersey was hanging in Defendant's backseat and he had a duffle bag full of clothes, which is consistent with his stated travel plans.

12

game was played on Sunday, and Defendant was not stopped by Trooper Webb in Oklahoma until the following Thursday. Thus, the lengthy trip Defendant took from California to Arkansas; from Arkansas to Illinois; from Illinois back to Arkansas; and Arkansas back to California transpired over the course of almost one week as opposed to one weekend.

Although Defendant's travel plans on their own may not suggest criminal activity, the Court finds that they are worthy of some consideration along with the other factors Trooper Webb identified. Trooper Webb also testified that it was significant that Defendant was able to afford airfare, a rental car, and a ticket to an NFL playoff game given that Defendant's sole source of income was derived from being a caretaker for his mother. *See, e.g., Bradford*, 423 F.3d at 1157-1158 (the court found reasonable suspicion where the defendant's travel plans defied common sense and were financially illogical).

7. *Totality of the Circumstances*

The Court finds that the above factors in their totality establish reasonable suspicion supporting Defendant's extended detention and permitting the use of the drug detection dog. *See Karam*, 496 F.3d at 1165 (internal quotation marks omitted) (the court may not "engage in a divide-and-conquer analysis, evaluating and disposing of each factor individually"; rather, the court must consider the factors as a whole); *see also Cervine*, 347 F.3d at 871 (reasonable suspicion can exist even if each factor on its own is susceptible of innocent explanation).

## B. Drug-Detection Dog's Free-Air Sniff of the Vehicle

As discussed above, Trooper Webb acted reasonably in detaining Defendant from the time of the initial stop until the time the drug dog was requested, which was about eight minutes. The Court also finds that Trooper Webb acted reasonably in detaining Defendant for an additional 10 minutes while he waited for Trooper Miller and Cash to arrive. *See United States v. Villa-Chaparro*, 115 F.3d 797, 802-803 (10th Cir. 1997) (finding an extended detention of almost 40 minutes waiting for a drug-sniffing dog was reasonable and did not violate the Fourth Amendment).

Further, the Court finds that Cash's alert on the passenger side of the car between the front and back doors gave OHP troopers probable cause to search the entire vehicle. "[A] canine alert toward the passenger area of a vehicle gives rise to probable cause to search the trunk as well." *United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004) ("A dog alert creates general probable cause to search a vehicle; it does not implicate the precision of a surgeon working with scalpel in hand."); *see also United States v. Parada*, 577 F.3d 1275, 1282-1283 (10th Cir. 2009) (officers had probable cause to search the entire vehicle based on the dog's alert to the front driver's side door).

Finally, the Court finds that Cash was adequately trained, certified, healthy, and reliable at the time of the free-air sniff of Defendant's vehicle. As the party seeking to suppress the evidence, Defendant bears the burden of proving that Cash was unqualified. *Id.* at 1283. Trooper Miller testified that he was Cash's CLEET certified handler beginning in October 2014 and was his handler at the time of the stop on January 10, 2019. He testified that Cash has been CLEET certified since October 2014, and that Cash is in good

health and was healthy on the date of the search. He advised that Cash completes monthly maintenance training and has been trained in all weather conditions. Trooper Miller further opined that Cash is "extremely accurate" in finding and communicating the odor of narcotics, and that Cash has never had a false positive in the hundreds of times he has been utilized.

Accordingly, Cash's alert provided Trooper Webb probable cause to search the vehicle.[7] *See Florida v. Harris*, 568 U.S. 237, 250 (2013); *Parada*, 577 F.3d at 1283; *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) (The Tenth Circuit "has consistently held that probable cause can be based on alerts by trained dogs.").

## CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress Evidence [Doc. No. 14] is DENIED.

**IT IS SO ORDERED** this 11th day of June 2019.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

---

[7] The fact that no narcotics were found in the car is inconsequential. The Court does "not evaluate probable cause in hindsight, based on what a search does or does not turn up." *See Florida v. Harris*, 568 U.S. 237, 249 (2013). Further, Trooper Miller testified that Cash is trained to alert to the *odor* of narcotics, and that he can detect a lingering or dead scent odor even when the substance is no longer present. A separate sniff was conducted by Cash of the currency at Troop SO Headquarters in Oklahoma City, and Cash alerted to the currency and its wrapping. After shaking the currency and its wrapping, a field test was performed on the results of the shake. The results, which were presumptively positive for marijuana, corroborated Cash's alerts on the vehicle and currency.

15